## WILLIAM DAVIS v. THE STATE.

1. MALICIOUS MISCHIEF.— See evidence held insufficient to sustain a conviction for wantonly killing a horse.
2. SAME.— In a trial for wantonly killing a horse it was in proof that the animal was a bad fence-breaker, and there was evidence tending to show that he was not shot from wantonness, but to prevent the destruction of defendant's crop. *Held* that, to countervail the presumption of innocence and warrant a conviction, it was incumbent on the State to prove that the defendant's crop was not properly protected against live-stock.

APPEAL from the County Court of Fort Bend. Tried below before the Hon. J. C. WILLIAMS, County Judge.

Appellant was charged by information with wantonly killing a horse, the property of K. W. Davis, in June, 1879. The jury found him guilty, and assessed his punishment at a fine of $100. A clear and compendious statement of the case is given in the opinion of this court. From the stand-point of the defense, however, the evidence in detail seems requisite. Defendant and the female witnesses were colored people.

K. W. Davis, for the State, testified that in the spring or summer of 1879 he lost a black horse worth $100. The horse was a bad fence-breaker; witness had to take him up several times on that account.

Mary Williams, for the State, testified that in June, 1879, she lived on the defendant's place, west of Big

creek. One evening she went to the creek for water, and while there heard the report of a gun. On her way back to the house, she saw the defendant, with a gun in his hand, driving a large, fine black horse out of the field. When defendant reached the fence he let it down and turned the horse out, which then crossed the path in front of witness, and she saw blood just streaming from a wound in its right shoulder. A day or two afterwards she saw the same horse, dead, at the creek. Witness had no hard feelings against defendant. On cross-examination the witness seems to have so adjusted the relative positions of the horse and herself that his left side was presented to her when she saw the blood streaming from his right shoulder. To the defendant's inquiry how she explained the matter, she made no reply. She showed that she knew her right hand from her left, and was then asked whether the horse was shot on the side at which a person gets upon a horse, or upon the opposite side; to which she replied that he was shot upon the side you get up on. She denied that she had stated at an examining trial that she saw no blood on the horse but saw blood on the fence and the grass. She also denied telling Reason Buchanan that the talk about defendant killing the horse was all a lie that Mary Lacey was fixing upon him because she was mad at him for not marrying her. And she further denied that she told Buchanan that she made her own statement at the examining court because defendant had treated her badly by getting her with child, and by saying that she needed no pay to swear for him; and that she would show the defendant what she could do. The witness repeated that the defendant was the man who had the gun, and who drove the horse out of the field, and she saw no one else who could have done the shooting.

Mary Lacey, for the State, testified that she lived with the defendant in June, 1879. On the day before the

horse was killed, the defendant loaded his gun with fifteen buckshot and said, "G—d d—n you, if you come in my field I'll fix you." The horse did not come in that evening. Next day he came in about twelve o'clock; defendant drove him out. He came in about the middle of the evening, and defendant drove him out again. Then he came in again about sunset, and the defendant took his gun and went out there; and directly the witness heard the gun fired. When the defendant came back the witness asked him if he had killed the horse, and he said he had not, but had fixed him so he would not get in his field any more. The next day witness saw the horse, dead, on the creek, with a hole in his right shoulder that a child could run its fist in. Witness did not tell anybody about it until after the defendant married Maria Phelps, and then she told it. The State closed.

The defense introduced three witnesses, who contradicted Mary Williams's denial of her former statements. One of them was Reason Buchanan, a freedman, who stated that Mary Lacey called him and told him to tell Mary Williams that the white folks had found out about the killing of that horse on Big creek, and would send for her, and she must swear that Bill Davis (the defendant) did it. When witness got home he told Mary Williams what Mary Lacey had said, and asked her to tell him the truth. This was the next day after the defendant married Maria Phelps. Mary Williams replied that she knew nothing about the horse being killed, and that it was a lie Mary Lacey had fixed up on Bill Davis because he had been sleeping with her and promised to marry her, and had married Maria Phelps. After that talk between Mary Williams and witness, Mary Lacey asked him if he had told Mary Williams what she had told witness to tell her; to which the witness replied that he had, and that Mary Williams denied it. Then Mary Lacey told witness to tell Mary Williams that when she

was sent for she must say that Bill Davis shot the horse, and she (Mary Lacey) would back her in it. After witness heard Mary Williams make her statement at the examining trial, he asked her how she came to do so after telling him, witness, what she had told him. She replied that Bill Davis had treated her badly, had got a child by her, and had said she did not need any pay to swear for him, and she intended to show him what she could do.

*W. L. Davidson*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

HURT, J. William Davis, the appellant, was convicted of wantonly killing a horse, the property of K. W. Davis. From the statement of facts it appears that the horse was "a bad fence-breaker," and that his owner "had to take him up several times on that account." That, on the day before the horse was killed, defendant loaded the gun, and swore that, if the horse came in his field, "he would fix him." The horse did not come in that evening. That on next day, about twelve o'clock, he came in and defendant drove him out. He came in again about the middle of the afternoon, and was driven out again by defendant, and, entering again about sundown, defendant took his gun and went out towards the horse, and the report of a gun was heard.

These facts in regard to the loading of the gun, entering the field by the horse and the conduct of defendant are found in the evidence of Mary Lacey. The horse was found dead from a gun-shot wound, not far off, a few days after.

Do the above facts support a verdict of guilty of *wantonly* killing the horse? We think not. The legal principles directly applicable to this question are very clearly stated in the following cases: *Branch* v. *State*, 41 Texas, 622; *Collier* v. *State*, 4 Texas Ct. App. 12; *Lott* v. *State*,

9 Texas Ct. App. 206; *Jones* v. *State,* 9 Texas Ct. App. 178.

It is suggested in *Branch* v. *State,* that the principles enunciated in that opinion " would not apply to a case where the crop was not properly protected against trespass by stock." Whether the principles so clearly stated in that and other subsequent opinions are in conflict with this suggestion, we will not stop at this place to discuss. Every presumption being in favor of the defendant, proof that the crop was not properly protected should have been made by the State, in order to carry the burden and establish the guilt of defendant by showing that the killing was wantonly done.

The evidence not supporting the verdict, the judgment is reversed and the cause remanded.

*Reversed and remanded.*